# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Voltage Holdings, LLC; Voltage Pictures, LLC; After Productions, LLC; After II Movie, LLC; After We Fell Productions, LTD; Venice PI, LLC; Bedeviled LLC; Colossal Movie Productions, LLC; Dallas Buyers Club, LLC; YAR Productions Inc.; Wonder One, LLC; REP PRODUCTIONS 12 LTD; Fun Mom Dinner, LLC; Chase Film Nevada LLC; H Films, Inc.; Ammo Entertainment, LLC; SF Film, LLC; MON, LLC; Goldenrod Holdings, LLC; and Rep Productions Scandi Ltd. | Case No. |
| Plaintiffs, | |
| v. | |
| Verizon Communications Inc. and Cellco Partnership | |
| Defendants. | |

## COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DMCA VIOLATIONS AND DEMAND FOR JURY TRIAL

**Table of Contents**

INTRODUCTION ...................................................................................................................1

NATURE OF THE ACTION ..................................................................................................2

PARTIES ...............................................................................................................................2

JURISDICTION AND VENUE ..............................................................................................4

FACTS ...................................................................................................................................5

A.   Plaintiffs own the copyrights to the motion pictures. .................................................5

B.   Third parties directly infringed Plaintiffs' copyrighted works using Verizon's
     internet services. .......................................................................................................7

     1.   The BitTorrent process. .....................................................................................7

     2.   Torrent files and torrent sites. ..........................................................................8

     3.   Verizon users reproduced, distributed, publicly displayed, and publicly
          performed Plaintiffs' Works using BitTorrent. ..................................................8

C.   Verizon knowingly materially contributed to its users' copyright infringements. ..........10

     1.   Verizon knew, had reason to know, or was willfully blind to, its users' direct
          infringements of Plaintiff's Works. ..................................................................10

     2.   Despite knowledge of specific infringements, Verizon continued to provide
          infringing accounts with services essential to infringement. .........................13

D.   Verizon vicariously infringed Plaintiffs' Works. ......................................................15

     1.   Verizon had the right and ability to supervise and control third parties'
          infringements. ..................................................................................................15

     2.   Verizon profits from facilitating online piracy. ...............................................16

E.   Verizon does not have a safe harbor from liability. ...................................................17

F.   Verizon users distributed copies of Plaintiffs' Works with false or altered
     copyright management information. ...........................................................................19

     1.   The distributed files contained false or altered copyright management
          information. ......................................................................................................19

     2.   Verizon users knew, had reason to know, or were willfully blind to the fact,
          that the copyright management information was false or altered. .................20

     3.   Verizon users knew, had reason to know, or were willfully blind to the fact,
          that their acts would induce, facilitate, or enable copyright infringement. ....22

G.   Verizon materially contributed to third parties' use of false or altered copyright
     management information. ...........................................................................................24

     1.   Verizon knew, had reason to know, or was willfully blind to its users' DMCA
          violations. ........................................................................................................24

2.      Despite knowledge of these violations, Verizon continued to facilitate the violations. ...........................................................................................................25

H.      **Verizon vicariously committed DMCA violations.** ............................................25

1.      Verizon had the right and ability to supervise and control third parties' DMCA violations. .................................................................................................25

2.      Verizon profits from third parties' violations. ....................................................26

FIRST CAUSE OF ACTION ...............................................................................................................26

SECOND CAUSE OF ACTION ...........................................................................................................27

THIRD CAUSE OF ACTION ...............................................................................................................28

FOURTH CAUSE OF ACTION ...........................................................................................................29

PRAYER FOR RELIEF .........................................................................................................................30

## INTRODUCTION

1.       Verizon is one of the largest internet service providers in the United States,
providing high-speed internet service to subscribers for a regular subscription fee.  For years,
Verizon has knowingly allowed Verizon users to engage in online piracy, the illegal distribution
and downloading of copyrighted materials, including films.  Verizon provides the IP addresses
used for piracy, makes the connections needed to share and download pirated films, and
transmits the pirated films.

2.       Verizon knows that it is facilitating mass online piracy.  Copyright owners have
repeatedly told Verizon that its services are used for piracy.  Voltage and its affiliates—the
producers and copyright owners of movies like *Dallas Buyers Club* and *I Feel Pretty*—have sent
Verizon more than one hundred thousand infringement notices.  In the last few years alone,
Verizon users have pirated Voltage's movies over six hundred thousand times.

3.       Online piracy hurts the producers of creative works, as well as the nation's
economy.  The US Chamber of Commerce estimated that online piracy costs the US economy
over 200,000 jobs, and over $30 billion, a year.

4.       Verizon can easily take action against online piracy.  Verizon can stop providing
internet service to a customer at any time.  It can stop providing internet services to customer
accounts that repeatedly use its services for piracy.  And Verizon doesn't have to find these
repeat offenders itself—copyright holders like Voltage already do that for Verizon, by sending
copyright infringement notices.  But Verizon does not take this simple step.

5.       That's because online piracy is lucrative for Verizon.  Verizon profits from
subscriptions to its internet services.  Instead of taking simple steps against illegal pirating,
Verizon turns a blind eye and continues to collect its customers' subscription payments every
month.  Verizon has been adding more internet subscribers every year since at least 2018.  By

not terminating and continuing to accept monthly payments from pirate accounts, Verizon earns an estimated $400 to $1,000 in additional profits per average pirate account, which adds tens of millions of dollars to Verizon's bottom line.

6.      But the law does not allow Verizon to enable—and profit from—online piracy. When an internet service provider like Verizon knows that its services are repeatedly used for illegal piracy that it can easily stop and yet it continues to facilitate this piracy for its own gain, the internet service provider is liable under federal law for the piracy.  This action seeks to hold Verizon accountable for the mass film piracy that it enables.

## NATURE OF THE ACTION

7.      This matter arises under the United States Copyright Act of 1976, as amended (the "Copyright Act").  17 U.S.C. §§ 101, et seq.

8.      Defendants are secondarily liable for copyright infringements in violation of sections 106 and 501 of the Copyright Act, and violations of section 1202 of the Digital Millennium Copyright Act ("DMCA").  17 U.S.C. §1202.

## PARTIES

9.      Plaintiffs are owners of the motion pictures at issue in this litigation.  Plaintiffs' motion pictures are currently available for sale online and in brick and mortar retail locations. These motion pictures include *Dallas Buyers Club* and *I Feel Pretty*.  Many of these motion pictures were released in theaters throughout the world and feature actors such as Matthew McConaughey, Jared Leto, Jennifer Garner, Amy Schumer, Michelle Williams, and Zac Efron.

10.     Plaintiff Voltage Pictures, LLC ("Voltage") is a limited liability company formed in California, with its principal place of business in Los Angeles, California.  Each of the other Plaintiffs is affiliated with Voltage.

11.     Plaintiff Voltage Holdings, LLC is a limited liability company formed in Nevada.

12.     Plaintiff After Productions, LLC is a limited liability company formed in California.

13.     Plaintiff After II Movie, LLC is a limited liability company formed in Nevada.

14.     Plaintiff After We Fell Productions, LTD is a legal entity formed in the United Kingdom.

15.     Plaintiff Venice PI, LLC is a limited liability company formed in California.

16.     Plaintiff Bedeviled LLC is a limited liability company formed in California.

17.     Plaintiff Colossal Movie Productions, LLC is a limited liability company formed in California.

18.     Plaintiff Dallas Buyers Club, LLC is a limited liability company formed in Texas.

19.     Plaintiff YAR Productions Inc. is a corporation formed in New York.

20.     Plaintiff Wonder One, LLC is a limited liability company formed in Wyoming.

21.     Plaintiff REP PRODUCTIONS 12 LTD is a corporation formed in the United Kingdom.

22.     Plaintiff Fun Mom Dinner, LLC is a limited liability company formed in Delaware.

23.     Plaintiff Chase Film Nevada LLC is a limited liability company formed in Nevada.

24.     Plaintiff H Films, Inc. is a corporation formed in California.

25.     Plaintiff Ammo Entertainment, LLC is a limited liability company formed in California.

26.     Plaintiff SF Film, LLC is a limited liability company formed in New York.

27.     Plaintiff MON, LLC is a limited liability company formed in California.

28.     Plaintiff Goldenrod Holdings, LLC is a limited liability company formed in Nevada.

29.     Plaintiff Rep Productions Scandi Ltd is a legal entity formed in the United Kingdom.

30.     Defendant Verizon Communications Inc. is a telecommunications company incorporated in Delaware, with its principal place of business in New York, New York.  Verizon Communications Inc. is one of the largest providers of high-speed internet services in the United States.  Verizon Communications Inc.'s internet service is also marketed under the Verizon Fios brand.

31.     Defendant Cellco Partnership (d/b/a Verizon Wireless) ("Cellco") is a legal entity organized under the laws of Delaware.  Cellco Partnership is a wholly-owned subsidiary of Verizon Communications Inc. and its executive decisions are made in New York.  Cellco's wireless internet service is marketed under the Verizon Wireless brand.

32.     The term "Verizon" in this complaint means both Cellco Partnership and Verizon Communications, Inc.

## JURISDICTION AND VENUE

33.     This is a civil action arising under the United States Copyright Act of 1976.  17 U.S.C. §§ 101, et seq.  This court therefore has subject matter jurisdiction over this action.  28 U.S.C. §1338.

34.     This court has personal jurisdiction over Defendants in this judicial district. Defendants' principal place of business is in New York, New York, in the Southern District of New York.

35.     Venue is proper in this district under section 1400 of the United States Code, because Defendants or Defendants' agents reside and may be found in this district.  28 U.S.C.

§1400(a).

## FACTS

**A.    Plaintiffs own the copyrights to the motion pictures.**

36.    Plaintiffs are the legal and/or beneficial owners of copyrights, including but not limited to, the rights to reproduce, distribute, publicly display, publicly perform, and prepare derivative works, in the following motion pictures:

37.    Plaintiff After Productions, LLC is a beneficial and actual owner of copyrights in the motion picture *After*.

38.    Plaintiff After II Movie, LLC is a beneficial and actual owner of copyrights in the motion picture *After We Collided.*

39.    Plaintiff After We Fell Productions, LTD is a beneficial and actual owner of copyrights in the motion picture *After We Fell.*

40.     Plaintiff Voltage Holdings, LLC is a beneficial and actual owner of copyrights in the motion pictures *Ava; A Family Man; Don Jon; Extremely Wicked, Shockingly Evil and Vile; Fathers & Daughters; First Love; Good Kill; I Feel Pretty; I.T.; Lady Bloodfight; Pay the Ghost; Revolt; Status Update; The Cobbler; The Professor and the Madman; The Company You Keep; The Necessary Death of Charlie Countryman;* and *Welcome Home.*

41.    Plaintiff Venice PI, LLC and Plaintiff Voltage Holdings, LLC are beneficial and actual owners of copyrights in the motion picture *Once Upon a Time in Venice.*

42.    Plaintiff Bedeviled LLC is a beneficial and actual owner of copyrights in the motion picture *Bedeviled.*

43.    Plaintiff Colossal Movie Productions, LLC is a beneficial and actual owner of copyrights in the motion picture *Colossal.*

44.    Plaintiff Dallas Buyers Club, LLC is a beneficial and actual owner of copyrights

in the motion picture *Dallas Buyers Club*.

45.     Plaintiff YAR Productions, Inc. is a beneficial and actual owner of copyrights in the motion picture *Distorted*.

46.     Plaintiff Wonder One, LLC is a beneficial and actual owner of copyrights in the motion picture *Disturbing the Peace*.

47.     Plaintiff REP PRODUCTIONS 12 LTD is a beneficial and actual owner of copyrights in the motion picture *Elizabeth Harvest*.

48.     Plaintiff Fun Mom Dinner, LLC a beneficial and actual owner of copyrights in the motion picture *Fun Mom Dinner*.

49.     Plaintiff Chase Film Nevada, LLC is a beneficial and actual owner of copyrights in the motion picture *Last Seen Alive*.

50.     Plaintiff H Films, Inc. is a beneficial and actual owner of copyrights in the motion picture *Redemption Day*.

51.     Plaintiff Ammo Entertainment, Inc. is a beneficial and actual owner of copyrights in the motion picture *Room 203*.

52.     Plaintiff SF Film, LLC is a beneficial and actual owner of copyrights in the motion picture *Skin*.

53.     Plaintiff MON, LLC is a beneficial and actual owner of copyrights in the motion pictures *Singularity* and *Welcome Home*.

54.     Plaintiff Goldenrod Holdings, LLC is a beneficial and actual owner of copyrights in the motion picture *Ted Bundy: American Boogeyman*.

55.     Plaintiff Rep Productions Scandi LTD is a beneficial and actual owner of copyrights in the motion picture *The Bird Catcher*.

56. Plaintiff Voltage Pictures, LLC is a beneficial owner of copyrights in the motion picture *The Rest of Us.*

57. Plaintiff Voltage Pictures, LLC is also a beneficial owner of each of these motion pictures.

58. Together, these motion pictures are referred to as the "Works." The Works are the subjects of copyright registrations, and this action is brought pursuant to section 411 of the Copyright Act. 17 U.S.C. § 411. The Works are motion pictures currently offered for sale in commerce.

**B. Third parties directly infringed Plaintiffs' copyrighted works using Verizon's internet services.**

**1. The BitTorrent process.**

59. Third parties using Verizon Communications Inc. and Cellco's internet services ("Verizon users") directly infringed Plaintiffs' rights in the Works. Verizon users engaged BitTorrent technology to reproduce, distribute, publicly perform, and publicly display Plaintiffs' Works without Plaintiffs' permission.

60. Torrenting is also known as peer-to-peer file sharing. It operates using a torrenting protocol—a set of rules governing the communication between computers—that allows computers to transfer files directly to many other computers.

61. BitTorrent is one of the most popular torrent protocols. BitTorrent joins computers in a "swarm" of host computers that download and upload pieces of a file from each other simultaneously. As soon as a user has downloaded a piece of the file, he or she starts sharing that piece with others in the swarm, while continuing to download the rest of the file.

62. BitTorrent thus makes it much quicker for many people to share and download a file, compared to the traditional method of directly downloading a whole file from one computer.

BitTorrent can be used to share any type of file, but many use it to share copyrighted films and recordings without the owner's permission—which is online piracy.

### 2. Torrent files and torrent sites.

63.     To download a film using BitTorrent technology, a user needs to obtain a torrent file.  A user can find and download a torrent file for pirating a particular movie from a torrent site.  A torrent site is a website that indexes and provides torrent files for download.  Examples of torrent sites are RARBG, 1337x, The Pirate Bay, seleZen, and YTS.  The United States Trade Representative has listed YTS and RARBG as examples of online marketplaces that engage in and facilitate substantial piracy.

64.     The user then engages the torrent file with a BitTorrent client, a computer program that implements the BitTorrent protocol.  The BitTorrent client uses information recorded in the torrent file to download a file constituting a digital version of a film, and to distribute the film to other computers in the "swarm" described above.  Once a user has downloaded all pieces of the film, the BitTorrent client verifies the pieces and reassembles them into a fully playable copy of the film.  The user has the film on his or her computer, to keep and use indefinitely.

### 3. Verizon users reproduced, distributed, publicly displayed, and publicly performed Plaintiffs' Works using BitTorrent.

65.     Publicly-available records from the American Registry for Internet Numbers ("ARIN") identify the IP addresses allocated respectively by Verizon Communications Inc. or Cellco Partnership.  ARIN initially allocates IP addresses to Verizon Communications Inc. or Cellco Partnership, and they reallocate IP addresses to their subscribers. These allocated IP addresses ("Verizon IP addresses") can then be used to access the internet, and transfer and receive files over the internet.  Verizon Communications Inc. and Cellco are required to report

the IP reallocation information to ARIN.  ARIN makes information about the reallocation of IP addresses publicly available on its Whois service.

66.     Plaintiffs engaged data providers such as Maverickeye UG ("Maverickeye") to identify the IP addresses that were used to engage the BitTorrent protocol and pirate copies of Plaintiffs' Works.

67.     Maverickeye used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.  Maverickeye extracted the resulting data from the investigation, and isolated the transactions and IP addresses associated with the files identified by their hash values.  Maverickeye logged information including the IP addresses, the hash values, and hit dates (access or use dates) that show that users of Verizon's internet services engaged BitTorrent to download and distribute copies of Plaintiffs' Works.  For each of the Works, Maverickeye verified that a full file distributed and downloaded in this process contained a digital copy of a motion picture that is identical (or alternatively, strikingly similar or substantially similar) to one of Plaintiffs' Works.  Maverickeye verified that the IP addresses were allocated by Verizon Communications Inc. or Cellco using publicly-available information from ARIN.

68.     Maverickeye's findings show that Verizon users downloaded pirated copies of Plaintiffs' Works to their computers and then transmitted pieces of Plaintiffs' Works to other computers in a swarm using BitTorrent, so that other computers can download re-assembled and fully-playable copies of Plaintiffs' Works.  These swarms included computers both within the United States and outside of the United States.  These transmissions are distributions of copyright-protected elements of Plaintiffs' Works to others.

69.     These transmissions are also performances and displays of the Works to the

public.  The transmissions are received by a significant number of other computers in the

BitTorrent swarm, and users at these other computers play the pirated motion pictures at separate

places and at separate times.  These other users constitute members of the "public" because they

are outside of the normal circle of a family and its social acquaintances.

70.     These acts also constitute reproducing Plaintiffs' Works.  When a Verizon user

finishes downloading all the pieces of a copied Work through the BitTorrent process, the

BitTorrent client reassembles the pieces into a full, playable copy of a Work on the user's

computer, thereby reproducing the Work.

71.     Maverickeye's investigations show that Verizon users infringed Plaintiffs' Works

in the manner described above hundreds of thousands of times in the past three years.  Each

instance of infringement used internet service (including connection and transmission services)

and IP addresses provided by and controlled by Verizon Communications Inc. or Cellco.

72.     For example, on April 11, 2021, a Verizon user downloaded and distributed a

copy of the Work *After We Collided*, under the file name "After.We.Collided.2020.WEB-

DL.1080p.seleZen.mkv," using Verizon Communication Inc.'s internet services and the Verizon

Communications Inc.'s IP address 108.24.74.252.

73.     For example, on July 15, 2022, a Cellco user downloaded and distributed a copy

of the Work *Ava*, under the file name "Ava.2020.REPACK.720p.WEBRip.800MB.x264-

GalaxyRG[TGx]," using Cellco's internet services (marketed under the Verizon Wireless brand)

and the Cellco IP address 174.194.150.142.

**C.     Verizon knowingly materially contributed to its users' copyright
        infringements.**

**1.     Verizon knew, had reason to know, or was willfully blind to, its users'
        direct infringements of Plaintiff's Works.**

74.     Plaintiffs' agents sent notices of infringement ("Notices") to Verizon

Communications Inc. and to Cellco for instances in which Maverickeye confirmed infringement of copyright-protected content using their respective IP addresses.

75.     Each Notice included at least the name of the copyright owner, the title of the Work, the name of infringing file, the IP address and port number where infringement was confirmed, the date and time of infringement, and that the infringement made use of the BitTorrent protocol.

76.     The recipient email address for the Notices was an email address that Verizon provided on its website for claims alleging copyright infringement.

77.     The Notices gave Verizon Communications Inc. and Cellco knowledge of specific instances of third parties' infringements of Plaintiffs' Works using their internet services.  In the alternative, these Notices gave Verizon Communications Inc. and Cellco reason to know of specific instances of infringements, or alerted them to the high probability that their users infringed Plaintiff's Works, and Verizon Communications Inc. and Cellco deliberately avoided confirming that fact.  If Verizon Communications Inc. or Cellco had any doubt as to the truth of these infringement notices, they could use the information contained in the Notices to investigate and verify the infringements.  For example, Verizon Communications Inc. or Cellco could have obtained the torrent file for downloading a movie, using the infringing file name contained in the Notices, and opened the file in a BitTorrent client to view information about the file, such as the infringing file's unique hash value.  Verizon Communications Inc. or Cellco could use this unique hash value to confirm that the file contains a copy of one of Plaintiff's Works.  For example, Verizon Communications Inc. or Cellco could have obtained data packets of the traffic from the IP addresses recorded in the Notices, and verified that they contain copies of one of Plaintiff's Works.

78.     Plaintiffs' agents sent Verizon Communications Inc. and Cellco hundreds of thousands of Notices about specific instances of infringements of Plaintiffs' Works using Verizon's internet services.

79.     For example, Plaintiffs' agent sent over 40,000 Notices to Defendants concerning infringement of the movie *I Feel Pretty* using Verizon internet services and Verizon IP addresses.

80.     For example, Plaintiffs' agent sent over 1000 Notices to Defendants concerning infringement of the movie *Dallas Buyers Club* using Verizon internet services and Verizon IP addresses.

81.     For example, Plaintiffs' agent sent over 10,000 Notices to Defendants concerning infringement of the movie *Extremely Wicked, Shockingly Evil and Vile* using Verizon internet services and Verizon IP addresses.

82.     For example, Plaintiffs' agent sent over 20,000 Notices to Defendants concerning infringement of the movie *Once Upon a Time in Venice* using Verizon internet services and Verizon IP addresses.

83.     For example, Plaintiffs' agent sent over 4,000 Notices to Defendants concerning infringement of the movie *A Family Man* using Verizon internet services and Verizon IP addresses.

84.     For example, Plaintiffs' agent sent over 25,000 Notices to Defendants concerning infringement of the movie *Ava* using Verizon internet services and Verizon IP addresses.

85.     For example, Plaintiffs' agent sent over 6,000 Notices to Defendants concerning infringement of the movie *After We Collided* using Verizon internet services and Verizon IP addresses.

86.     For example, Plaintiffs' agent sent over 6,000 Notices to Defendants concerning infringement of the movie *The Professor and the Madman* using Verizon internet services and Verizon IP addresses.

87.     For example, Plaintiffs' agent sent over 5,000 Notices to Defendants concerning infringement of the movie *Status Update* using Verizon internet services and Verizon IP addresses.

88.     Plaintiffs also made further efforts to notify Verizon Communications Inc. and Cellco of specific instances of infringements of Plaintiffs' Works using their internet services and IP addresses.  For example, Plaintiffs' agent attempted to notify Verizon Communications Inc. and Cellco about specific instances of infringements of Plaintiffs' Works by contacting the Verizon Anti-Piracy Cooperation Program and by contacting several phone numbers provided by Verizon.

> **2.     Despite knowledge of specific infringements, Verizon continued to provide infringing accounts with services essential to infringement.**

89.     As alleged above, Verizon Communications Inc. and Cellco knew, had reason to know, or was willfully blind to, copyright infringements using internet service and IP addresses provided by and controlled by Verizon Communications Inc. or Cellco, including knowledge of repeat infringements from Verizon IP addresses.

90.     But Verizon Communications Inc. and Cellco did not take meaningful action to prevent ongoing infringements by their users.  Verizon Communications Inc. and Cellco failed to terminate the accounts associated with these IP addresses or otherwise take any meaningful action in response to these Notices.  Verizon Communications Inc. and Cellco often failed to even forward the Notices to their internet service customers or otherwise inform them about the Notice or its contents.

13

91.     Instead, Defendants continued to provide the internet access and services necessary for users to commit further online piracy.  Defendants continued to provide access to the internet from the IP addresses that infringers used to pirate movies.  Defendants also continued to transmit copies of Plaintiffs' Works to a user's computer for infringing reproduction, infringing public performance, and/or infringing public display when a user was downloading a Work.  And Defendants continued to transmit copies of Plaintiffs' Works from a user's computer to distribute the Work, and for reproduction, public performance, and public display.  The provision of these internet services is an essential step in the third-party infringements, and substantially magnifies the underlying infringements.

92.     Maverickeye also investigates infringements of other copyright-protected motion pictures as well as Plaintiffs' Works, and records notices of infringements sent to Verizon Communications Inc. and Cellco regarding those infringements.  Maverickeye's records show that Verizon Communications Inc. and Cellco received hundreds of notices about infringements at certain Verizon IP addresses.  This evidence further shows that Verizon Communications Inc. and Cellco do not terminate their internet services to repeat infringing accounts.  And these records show that Verizon Communications Inc. and Cellco's continued provision of internet services to these accounts substantially magnifies infringing activity at these accounts.

93.     For example, Verizon Communications Inc. failed to terminate the account of its subscriber at IP address 71.105.149.126 even after Verizon Communications Inc. received multiple notices of copyright infringement at this address.  Verizon Communications Inc. received at least 800 notices of copyright infringement for this IP address.  Each notice accounted for at least one instance of infringement.

94.     For example, Verizon Communications Inc. failed to terminate the account of its

subscriber at IP address 173.63.236.115 even after Verizon Communications Inc. received multiple notices of copyright infringement at this address. Verizon Communications Inc. received at least 700 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

95. For example, Verizon Communications Inc. failed to terminate the account of its subscriber at IP address 173.75.233.63 even after Verizon Communications Inc. received multiple notices of copyright infringement at this address. Verizon Communications Inc. received at least 600 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

96. For example, Verizon Communications Inc. failed to terminate the account of its subscriber at IP address 100.11.52.254 even after Verizon Communications Inc. received multiple notices of copyright infringement at this address. Verizon Communications Inc. received at least 500 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

97. For example, Verizon Communications Inc. failed to terminate the account of its subscriber at IP address 74.110.146.62 even after Verizon Communications Inc. received multiple notices of copyright infringement at this address. Verizon Communications Inc. received at least 400 notices of copyright infringement for this IP address. Each notice accounted for at least one instance of infringement.

**D.    Verizon vicariously infringed Plaintiffs' Works.**

**1.    Verizon had the right and ability to supervise and control third parties' infringements.**

98. Verizon supervised and controlled the infringing activity of third parties because it had the right and ability to terminate its internet services to a customer's account at any time.

In its terms of service, Verizon expressly reserved the right to terminate internet services to customers at any time for violating copyright law.

99.     Termination of internet services to infringing accounts would stop infringing activity at those accounts.  And Verizon's provision of internet services is an essential step in users' copyright infringements at Verizon accounts.  But, as alleged above, Verizon did not terminate internet services to known, infringing accounts.  And Verizon continues to provide internet services to known, infringing accounts.

### 2.     Verizon profits from facilitating online piracy.

100.    By continuing to provide internet services to accounts used for repeat infringement, rather than terminating such accounts, Verizon can continue to receive subscription payments from those accounts.  For example, Verizon Communications Inc. currently offers residential internet services in exchange for monthly payments, ranging from $24.99 per month to $64.99 per month.  For example, Cellco offers a range of different plans for wireless internet services, ranging from $30 per month per line to $90 per month per line for unlimited internet services.  If Verizon Communications Inc. or Cellco terminated the internet account of, or stopped providing internet services to, an existing customer due to copyright infringements at their account, then they could no longer collect monthly payments from that customer.  By not terminating the account, Verizon Communications Inc. or Cellco continues to receive monthly payments from that account for years into the future.  For example, if Verizon Communications Inc. fails to terminate a pirate account, and that subscriber continues as a subscriber for another 5 years at $65 per month, Verizon Communications Inc. would earn an additional $3900 in revenue from that subscriber, most of which would be profits for Verizon Communications Inc..

101.    The ability to use Verizon's internet services for pirating is also a draw for

Verizon's customers and potential customers.  Verizon's refusal or failure to take action against known copyright infringement is a draw for customers to purchase Verizon's internet services. Verizon's continued services to customers, after Verizon receives notice that they infringed copyrights using Verizon's service, is similarly a draw for customers to purchase Verizon's services.  As alleged above, certain Verizon Communications Inc.'s users continued to use Verizon Communications Inc.'s services to infringe copyrights, even after Verizon Communications Inc. received hundreds of copyright infringement notices for those customer accounts.

### E.      Verizon does not have a safe harbor from liability.

102.     In 1988, Congress passed the Digital Millennium Copyright Act (DMCA), which provides protection or a "safe harbor" from liability for service providers.  But the DMCA only protects a service provider if the service provider "has adopted and reasonably implemented… a policy that provides for the termination in appropriate circumstances of subscribers… who are repeat infringers."  17 U.S.C. §512(i)(1)(A).

103.     Verizon claims that it has such a policy, but in fact, at all relevant times, Verizon had neither adopted nor reasonably implemented a policy that provides for the termination of repeat infringers in appropriate circumstances.

104.     Verizon had a DMCA policy published on its website as of July 7, 2021.  But Verizon's adoption and implementation of its policy made it unreasonably difficult for copyright holders to notify Verizon of copyright infringements.  Verizon's adoption and implementation of its policy is so onerous on copyright holders—such as by requiring that copyright holders agree "not to file a copyright infringement lawsuit against Verizon … as a result of Notices sent to Verizon" and by charging copyright holders "$75 per hour at a minimum of one hour per IP address lookup"—that they amount to efforts to avoid terminating repeat infringers.  And

Verizon in fact did not terminate the accounts of known, repeat infringers.

105.    Verizon's policy declared that Verizon will not process information about certain infringements—including infringements using peer-to-peer file sharing technology—that were received via Verizon's DMCA Designated Agent "because of the high volume of notices we are asked to process."  For notifications of infringements using peer-to-peer file sharing technology, Verizon required copyright holders to fill out and submit Conduit Notice Forms.  But Verizon prohibited the use of automated processes to fill out these forms, making it unreasonably difficult for copyright holders to notify Verizon of mass piracy using peer-to-peer file sharing technology. Verizon also reserved "the right to limit the number of forwarded notices per copyright owner."

106.    For notifications of infringements using peer-to-peer file sharing technology, Verizon offered copyright holders a contract to participate in the Verizon Anti-Piracy Cooperation program.  But this contract required copyright holders to agree to onerous terms before Verizon would forward infringement notices, including: that the copyright holder agree "not to file a copyright infringement lawsuit against Verizon during or after the termination of [the agreement] as a result of Notices sent to Verizon during the term of [the agreement];" that the copyright holder pay a processing fee at a rate of "$75 per hour at a minimum of one hour per IP address lookup;" that the copyright holder agree that "Verizon may limit at its discretion the number of Notices to Subscribers in the Notice Forwarding System on a monthly basis;" that the copyright holder agree to "indemnify, defend and hold Verizon… harmless from and against any liability, claims or other damages arising from [the copyright holder's] errors in the submission of IP addresses to Verizon, and/or Verizon's forwarding of Notices to Subscribers incorrectly identified by [the copyright holder];" and that the copyright holder agree that "[the agreement] shall not be disclosed to the public by [the copyright holder] or Verizon or used by [the copyright

holder] to support the need for legislation or regulations mandating a notice forwarding program

or a graduated response mechanism."

107.   Verizon did not terminate customer accounts even if it received information about

a high number of repeat infringements at those customer accounts.  As alleged above, for

example, Verizon Communications Inc. has allowed hundreds of infringements to occur at

certain accounts, despite receiving at least as many notices of infringement regarding those

accounts.  And Verizon users have reported receiving multiple infringement notices from

Verizon without having their accounts terminated.

**F.**   **Verizon users distributed copies of Plaintiffs' Works with false or altered copyright management information.**

108.   Section 1202 of the DMCA prohibits the distribution of false copyright

management information with intent to induce, facilitate, or enable copyright infringement.  17

U.S.C. §1202(a).  Section 1202 also prohibits a user's distribution of altered copyright

management information, and a user's distribution or public performance of works or copied

works with altered copyright management information, if the user knows or has reason to know

that these acts would induce, facilitate, or enable copyright infringement.  17 U.S.C. §1202(b).

By using BitTorrent to pirate movies, Verizon users committed DMCA violations.

**1.**   **The distributed files contained false or altered copyright management information.**

109.   As alleged above, Verizon users engaged BitTorrent technology to distribute and

download copies of Plaintiffs' Works.  The name of a file distributed and downloaded in this

manner is copyright management information, because it is information conveyed in connection

with copies of a work, or performances or displays of a work, in digital form, including the title

and other information identifying the work.  But many of the distributed files include false or

altered copyright management information.  Many of the file names also include information in a

format that is customary for pirating movies, such as the name or Uniform Resource Locater ("URL") of a torrent site, or a label indicating the method of copying the movie, such as "BDRip" or "WEB-DL."  For example, the file name of a pirated copy of Plaintiffs' Work distributed through BitTorrent technology was: "After.We.Collided.2020.WEB-DL.1080p.seleZen.mkv."  This file name includes the title and release date identifying a copy of the Work *After We Collided*.  It also includes the name of the torrent site "seleZen."  And it includes a label indicating the method by which the movie was copied, "WEB-DL."  For example, the file name of a pirated copy of Plaintiffs' Work distributed through BitTorrent technology is "Room 203 (2022) [1080p] [WEBRip] [5.1] [YTS.MX]."  This file name includes the title and release date identifying a copy of the Work *Room 203*.  It also includes the name and URL of the torrent site "YTS.MX."  And it includes a label indicating the method by which the movie was copied, "WEBRip."

110.   This information is false or altered copyright management information because the copyright management information of a legitimate file of Plaintiffs' Works does not contain the name or URL of a torrent site, and does not contain a label indicating the method of copying the movie file.  And such information does not convey information about the true author, producer, licensor, or distributor of the Work.  Instead, such information refers to the illegal pirating of the Work.  Therefore, the information is either false information about the legitimate, copyrighted Work, or else an alteration of the copyright management information of the legitimate, copyrighted Work.

### 2. Verizon users knew, had reason to know, or were willfully blind to the fact, that the copyright management information was false or altered.

111.   Verizon users knew, had reason to know, or were willfully blind to the fact, that file names containing the name or URL of torrent sites, or a label indicating the method of

copying a movie, were false or altered copyright management information.

112.    When users engaged in online piracy using BitTorrent, they knew that torrent sites are used for pirating, and that the films obtained through this process are infringing copies. These users are, by definition, online users obtaining films from internet sources.  A search of any of Plaintiffs' Works in a search engine for sites that allow renting or buying a film would produce sites such as on Amazon Prime Video, Apple iTunes, or Google Play, all of which post prices for renting or buying the film.  The users knew that obtaining a legal copy of a film requires payment (either directly if acquiring a single film, or indirectly, by subscribing to a service such as Netflix).  By contrast, obtaining a film using BitTorrent technology requires actively looking for a torrent site with pirated movies, looking for and obtaining a torrent file to pirate a particular movie, and engaging the torrent file with a BitTorrent client to download the film for no payment.  All of the infringing Verizon users obtained the films using torrent sites, torrent files, and BitTorrent technology, at no cost.

113.    Many of the users had even registered an account with a torrent site, like YTS. The YTS website operator maintained records of activity of registered YTS user accounts created from Verizon IP addresses.  The records include the email address of the registered user account, the torrent files that the registered account downloaded, the IP address from which the registered user accessed the YTS website, and the dates of download.  These records show that Verizon users downloaded torrent files for pirating Plaintiffs' Works.  For example, a Verizon Communications Inc. user registered an account with the YTS website from the Verizon IP address 173.79.187.134 using the email address ss.k****@yahoo.com and, on March 1, 2019, downloaded the torrent file for pirating the Work *I Feel Pretty.*  For example, a Cellco user registered an account with the YTS website from the Cellco IP address 174.253.85.252 using the

email address jimmy*******@gmail.com and, on December 13, 2018, downloaded the torrent file for pirating the Work *I Feel Pretty*.

114.    As a result, these Verizon Communications Inc. and Cellco users knew, had reason to know, or were willfully blind to the fact, that they were obtaining pirated copies of the films; that the name or URL of a torrent site like "seleZen" or "YTS.MX" is not the true title, author, producer, or licensed distributor of any of the Works; that a legitimate copy of a Work is not copied or "ripped" from a streaming service, as a label like "WEB-DL" indicates; that such information refers to the illegal reproduction and distributing of a Work, or generally to pirating; and therefore that a legitimate file name of a Work does not include the name or URL of a torrent site, and does not include a label indicating the method by which a movie file was copied.

> **3.    Verizon users knew, had reason to know, or were willfully blind to the fact, that their acts would induce, facilitate, or enable copyright infringement.**

115.    As alleged above, these Verizon Communications Inc. and Cellco users knew that, by acquiring films from a torrent site using a BitTorrent client, they were engaged in infringement.

116.    They knew that distributing the false or altered copyright management information, and distributing or publicly performing copied Works with false or altered copyright management information, would induce, facilitate, or enable further pirating.  The users knew, had reason to know, or were willfully blind to the fact, that the name or URL of a torrent site would enhance awareness of a torrent site, or enhance the reputation of a torrent site; that the URL of a torrent site may induce, facilitate, or enable further infringements by helping other users to find and access the torrent site to pirate movies; that a label indicating the method by which a movie was copied would facilitate further pirating, by assisting others in choosing a particular torrent file for pirating.  Accordingly, Verizon users knew, or had reasonable grounds

to know, or were willfully blind to the fact, that their acts would induce, facilitate, or enable copyright infringement.

117.    Verizon users knowingly distributed false or altered copyright management information, and distributed and publicly performed copied Works with false or altered copyright management information, in the manner alleged above, thousands and thousands of times.

118.    For example, a Verizon Communications Inc. user using Verizon Communications Inc. internet services and the Verizon Communications Inc. IP address 108.24.74.252 downloaded and distributed copies of the Work *After We Collided* with the file name "After.We.Collided.2020.WEB-DL.1080p.seleZen.mkv."

119.    "seleZen" is the name of a torrent site. "seleZen" is not included in the copyright management information of legitimate copies or streams of the Work  *After We Collided.*

120.    For example, a Verizon Communications Inc. user using Verizon Communications Inc. internet services and the Verizon Communications Inc. IP address 173.63.65.32 downloaded and distributed copies of the Work *Room 203* with the file name "Room 203 (2022) [1080p] [WEBRip] [5.1] [YTS.MX]."

121.    "YTS.MAX" is the name and URL of a torrent site. "YTS.MX" is not included in the copyright management information of legitimate copies or streams of the Work *Room 203.*

122.    For example, a Cellco user using Cellco internet services (marketed under the Verizon Wireless brand) and Cellco IP address 174.194.150.142 downloaded and distributed copies of the Work *Ava* with the file name "Ava.2020.REPACK.720p.WEBRip.800MB.x264-GalaxyRG[TGx]."

123.    "WEBRip" is a label indicating the method by which a movie was copied. "WEBRip" is not included in the copyright management information of legitimate copies or

streams of the Work *Ava.*

124.    Adding the name or URL of torrent sites like "seleZen" or "YTS.mX" enhances the reputation of the torrent site, create potential users' awareness of the torrent site, and attract users to the torrent site.  And labels indicating the method of copying, like "WEB-DL" or "WEBRip," facilitate or induce pirating by informing a user of the type of movie copies that are available for torrenting.

**G.    Verizon materially contributed to third parties' use of false or altered copyright management information.**

**1.    Verizon knew, had reason to know, or was willfully blind to its users' DMCA violations.**

125.    As alleged above, Plaintiffs' agents sent Notices to Verizon Communications Inc. and Cellco for instances in which Maverickeye confirmed infringement of copyright-protected content at Verizon IP addresses.  These Notices included at least the name of the copyright owner, the title of the Work, that the work was infringed using BitTorrent, the file name that includes the false or altered copyright management information, the IP address and port number where infringement was confirmed, and the time of infringement.

126.    The Notices gave Defendants knowledge of specific instances of third parties' DMCA violations using Defendants' internet services.  In the alternative, the Notices gave Defendants reason to know of specific instances of infringements, or alerted Defendants to the high probability that Defendants' users committed DMCA violations, and Defendants deliberately avoided learning that fact.  For example, the Notices showed that users pirated Plaintiffs' Works with file names containing the name or URL of a torrent site.  For example, the Notices showed that users pirated Works with file names containing a label indicating the method by which a movie was copied, such as "WEB-DL."  If Defendants had any doubt that users had pirated Works with such file names, then it could have easily investigated to verify that

information.  For example, Defendants could have taken the steps alleged above to verify that third parties infringed Plaintiffs' Works from Defendants' IP addresses.  And Defendants could compare the infringing file name recorded on the Notices with the copyright management information of a legitimate copy of one of Plaintiff's copyrighted Works, such as in the copyright registration for the film, the credits of the films, or in the file name of a legitimate Blu-ray disc copy of the film.

> **2.     Despite knowledge of these violations, Verizon continued to facilitate the violations.**

127.    Despite knowledge of specific and repeat DMCA violations, Verizon Communications Inc. and Cellco continued to provide internet services to facilitate the violations.  Specifically, Verizon Communications Inc. and Cellco continued to provide access to internet services at IP addresses that committed DMCA violations.  And Verizon Communications Inc. and Cellco continued to provide the transmissions necessary for users to commit DMCA violations while pirating Plaintiffs' Works.  The provision of internet services is an essential step in users' DMCA violations while pirating movies.  And the provision of internet services substantially magnifies users' DMCA violations while pirating movies.  As discussed, Verizon received hundreds of Notices concerning infringements at certain accounts.  And a substantial number of these infringements used file names containing the name or URL of a torrent site, or a label indicating the method by which a movie was copied.

> **H.     Verizon vicariously committed DMCA violations.**

> **1.     Verizon had the right and ability to supervise and control third parties' DMCA violations.**

128.    As alleged above, Defendants can terminate its internet services to a customer's account at any time.  Termination of internet services to infringing accounts would stop DMCA violations at those accounts.

2. **Verizon profits from third parties' violations.**

129.    If Verizon Communications Inc. or Cellco continues to provide internet services to customer accounts used for repeat DMCA violations while pirating movies, then they can continue to receive subscription payments for those accounts.

130.    As alleged above, Verizon Communications Inc. and Cellco offer internet services in exchange for monthly payments.  If Verizon Communications Inc. or Cellco terminated the internet account of, or stopped providing internet services to, an existing customer due to repeat DMCA violations at their account, then they could no longer collect monthly payments from that customer.

131.    The ability to use Defendants' internet services for DMCA violations while pirating is also a draw for Defendants' customers and potential customers.  Defendants' refusal or failure to take action against such violations are a draw for customers to purchase Defendants' internet services and to use those services.

## FIRST CAUSE OF ACTION
### (contributory copyright infringement)

132.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

133.    Plaintiffs are the legal and/or beneficial copyright owners of the Works, including the rights to reproduce, distribute, publicly perform, publicly display, and prepare derivative works of the Works.

134.    Third parties using Defendants' internet services directly infringed Plaintiffs' Works.  Specifically, these users infringed Plaintiffs' rights to reproduce, distribute, publicly perform, and publicly display, the Works.  Without Plaintiffs' authorization, these users also imported copies of Plaintiffs' Works into the United States, exported copies of Plaintiffs' Works

to outside of the United States, and imported copies of Plaintiffs' Works that have been acquired outside the United States, in violation of section 602.  17 U.S.C. §602(a)(1) and (2).

135.    Defendants materially contributed to these third parties' infringements.  As demonstrated above, Defendants knew (or in the alternative had reason to know, or was willfully blind to the fact) that third parties' infringed Plaintiffs' Works using Defendants' internet services.  Despite this knowledge, Defendants facilitated the infringements by continuing to provide the internet access and services necessary for further infringements, and failing to take meaningful steps to minimize or prevent infringements.  Defendants' provision of internet services is an essential step in the third parties' infringements.

136.    Defendants' contributory infringement was a substantial factor in causing Plaintiffs to lose profits and in causing Defendants to earn additional profits.  Defendants' contributory infringement was also a substantial factor in causing numerous violations of the Copyright Act that are eligible for statutory damages.

137.    Defendants' contributory infringements were committed "willfully' within the meaning of section 504(c)(2) of the Copyright Act.  17 U.S.C. §504(c)(2).

**SECOND CAUSE OF ACTION**
**(vicarious copyright infringement)**

138.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

139.    Plaintiffs are the legal and/or beneficial copyright owners of the Works, including the rights to reproduce, distribute, publicly perform, publicly display, and prepare derivative works of the Works.

140.    Third parties using Defendants' internet services directly infringed Plaintiffs' Works.  Specifically, these users infringed Plaintiffs' rights to reproduce, distribute, publicly

27

perform, and publicly display, the Works.

141.    Defendants are vicariously liable for the third parties' infringements.  As demonstrated above, Defendants had the legal right and practical ability to supervise and control the infringements.

142.    And as demonstrated above, Defendants had a direct financial interest in the third-party infringing acts.

143.    Defendants' vicarious contributory infringement was a substantial factor in causing Plaintiffs to lose profits and in causing Defendants to earn additional profits. Defendants' contributory infringement was also a substantial factor in causing numerous violations of the Copyright Act that are eligible for statutory damages.

**THIRD CAUSE OF ACTION**
**(contributory violation**
**of the Digital Millennium Copyright Act)**

144.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

145.    Third parties using Defendants' internet services knowingly distributed false copyright management information while pirating Plaintiffs' Works.  These third parties did so with the intent to induce, enable, or facilitate copyright infringement.

146.    Third parties using Defendants' internet services distributed or publicly performed Plaintiffs' Works or copies of Plaintiffs Works knowing that copyright management information had been altered without authority of the copyright owner or the law.  These third parties did so knowing or having reasonable grounds to know that their acts will induce, enable, or facilitate copyright infringement.

147.    These acts constitute violations of section 1202 of the Digital Millennium

Copyright Act ("DMCA violations").  17 U.S.C.S. §1202(a)-(b).

148.    Defendants materially contributed to the DMCA violations.  As demonstrated above, Defendants knew (or in the alternative had reason to know or was willfully blind to the fact) that third parties were committing these violations using Defendants' internet services. Despite this knowledge, Defendants continued to facilitate the violations by providing internet services to users at these accounts, and failing to take steps to minimize or prevent further violations.  Defendants' provision of internet services is an essential part of third parties' DMCA violations.

149.    Defendants' contributory violations of the DMCA were a substantial factor in causing Plaintiffs to lose profits and in causing Defendants to earn additional profits. Defendants' contributory violations were also a substantial factor in causing numerous violations of the DMCA that are eligible for statutory damages.

**FOURTH CAUSE OF ACTION**
**(vicarious violation**
**of the Digital Millennium Copyright Act)**

150.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

151.    Third parties using Defendants' internet services knowingly distributed false copyright management information while pirating Plaintiffs' Works.  These third parties did so with the intent to induce, enable, or facilitate copyright infringement.

152.    Third parties using Defendants' internet services distributed or publicly performed Plaintiffs' Works or copies of Plaintiffs Works knowing that copyright management information had been altered without authority of the copyright owner or the law.  These third parties did so knowing or having reasonable grounds to know that their acts will induce, enable,

or facilitate copyright infringement.

153.    These acts constitute violations of section 1202 of the Digital Millennium Copyright Act ("DMCA violations").  17 U.S.C.S. §1202(a)-(b).

154.    Defendants are vicariously liable for these DMCA violations.  Defendants had the legal right and practical ability to supervise and control the third parties' DMCA violations.

155.    And Defendants had a direct financial interest in third parties' DMCA violations.

156.    Defendants' vicarious violations of the DMCA were a substantial factor in causing Plaintiffs to lose profits and in causing Defendants to earn additional profits. Defendants' vicarious violations were also a substantial factor in causing numerous violations of the DMCA eligible for statutory damages.

## PRAYER FOR RELIEF

157.    WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    award Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiff's election, for statutory damages pursuant to 17 U.S.C. §504(a) and (c) against Defendants;

(b)    award Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. §505 and/or 17 U.S.C. §1203(b)((5);

(c)    award Plaintiffs their actual damages from violations of section 1202(a)- (b) of the Digital Millennium Copyright Act and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiff's election, statutory damages for each violation pursuant to 17 U.S.C. §1203(c);

(d)    order Defendants to adopt and reasonably implement a policy that provides for the termination of internet services to accounts at which there

is repeat copyright infringements, under appropriate circumstances;

(e)     order Defendants to block users from accessing notorious piracy websites

of foreign origin including those listed in the annual trade report of

Notorious Foreign Markets published by the United States Government

such as (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x on networks

under its control to prevent further pirating of Plaintiffs' Works; and

(f)     grant the Plaintiffs any and all other and further relief that this Court

deems just and proper.

**Plaintiffs hereby demand a jury trial on all issues properly triable by jury.**

Dated: September 6, 2022

Respectfully submitted,

By:_____

Counsel

Peter J. Sluka (Bar ID:  PS1449)
**FARRELL FRITZ, P.C.**
622 Third Ave., 37th Fl.
New York, NY 10017
Tel: 646-237-1819
Email: psluka@farrellfritz.com

Greg Dovel* (CA State Bar No. 135387)
Joanne Bui* (CA State Bar No. 340378)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel:  310-656-7066
Email:  greg@dovel.com

- and –

Kerry S. Culpepper* (HI Bar No. 9837)
**CULPEPPER IP, LLC**
75-170 Hualalai Rd., Suite B204
Kailua-Kona, HI 96740
Tel:  808-464-4047

*Counsel for Plaintiff*
**Pro hac vice* admission to be sought